**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| Farah IBRAHIM, Ibrahim MUSA, Khalid Abdallah MOHMED, Ismail JIMCALE ABDULLAH, Abdiwali Ahmed SIYAD, Ismael Abdirashed MOHAMED, and Khadar Abdi IBRAHIM on behalf of themselves and all those similarly situated, | Case No.: |
| Plaintiffs/Petitioners, | CLASS ACTION |
| v. | |
| Juan ACOSTA, Assistant Field Officer Director, Miami Field Office, Immigration and Customs Enforcement; David HARDIN, Sheriff of Glades County; Marc J. MOORE, Field Office Director, Miami Field Office, Immigration Customs Enforcement; Thomas HOMAN, Acting Director, Immigration and Customs Enforcement; Kirstjen NIELSEN, Secretary of Homeland Security. | |
| Defendants/Respondents. | |

---

**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CLASS PETITION FOR WRIT OF HABEAS CORPUS**

On behalf of themselves and the class of individuals similarly situated, Plaintiffs/Petitioners Farah Ibrahim, Ibrahim Musa, Khalid Abdallah Mohmed, Ismail Jimcale, Abdiwali Ahmed Siyad, Ismael Abdirashed Mohamed, and Khadar Abdi Mohamed sue Defendants/Respondents Juan Acosta, David Hardin, Marc J. Moore, Thomas Homan, and Kirstjen Nielsen, and state the following:

1

## INTRODUCTION

1.      Plaintiffs/Petitioners and the class they represent are 92 people who ICE subjected to inhumane conditions and egregious abuse during a failed attempt to deport them by plane to Somalia on December 7, 2017. For almost two days, the men and women sat bound and shackled in an ICE-chartered airplane. The plane departed Louisiana bound for Somalia, but only made it as far as Dakar, Senegal. The plane sat on a runway at the Dakar airport for 23 hours.

2.      As the plane sat on the runway, the 92 detainees remained bound, their handcuffs secured to their waists, and their feet shackled together. When the plane's toilets overfilled with human waste, some of the detainees were left to urinate into bottles or on themselves. ICE agents wrapped some who protested, or just stood up to ask a question, in full-body restraints. ICE agents kicked, struck, or dragged detainees down the aisle of the plane, and subjected some to verbal abuse and threats.

3.      ICE ultimately aborted the trip and flew back to the United States, landing in Miami. In the early morning of Saturday, December 9th, ICE transported the still-shackled detainees to its two detention centers in the South Florida area. ICE has indicated it will attempt to fly the detainees to Somalia again this week, likely on Wednesday, December 20, 2017, but possibly sooner.

4.      The ICE flight never reached Somalia, but the story of the 92 detainees did, riding a wave of press coverage in international news outlets from the New York Times to the BBC. This in turn triggered widespread reporting and speculation about the U.S. deportees in the Somali media. *See* Declaration of Abdinasir M. Abdulahi, Attached to Motion for Temporary Restraining Order (listing numerous links to Somali media coverage).

5.     The extraordinary public attention that ICE's misconduct has drawn to the 92 detainees matters because it is a unique circumstance that puts them in danger of being targeted by the anti-American, anti-Western terrorist organization, Al Shebaab. Al Shebaab is an ally of Al Qaeda and is waging a war against Somalia's fragile government.

6.     As Mary Harper, Africa Editor for BBC News, explains, Al Shabaab perceives Somalis who are returning to the country after periods living in western nations as enemies of their cause who must be summarily executed. *See* Declaration of Mary Harper, Attached to Motion for Temporary Restraining Order. Al Shabaab's violent attacks on Somali civilians whom it deems enemies are helping create what the United States has declared to be "one of the worst humanitarian crises in the world."  82 FR 4907 (renewing Temporary Protected Status to certain Somalis in the United States based on the severe level of danger).

7.     ICE's abusive and attention-drawing actions on the December 7 flight occurred just weeks after Al Shabaab's massive bomb attack in Mogadishu on October 14, 2017. This terrorist attack killed over 500 people and was a transformative event widely referred to as "Somalia's 9/11." The October 14th attack prompted the United States to launch bombing raids against Al Shabaab inside Somalia in November.

8.     The dramatic escalation of Al Shabaab's terrorist violence coupled with the U.S. military's retaliation are additional new circumstances that enhance the risks created by media coverage about ICE detainees.

9.     Plaintiffs/Petitioners face imminent removal to Somalia, where they will likely be killed or harmed due to changed circumstances in Somalia created by the media coverage and notoriety of the aborted and abusive December 7 flight.

10.     U.S. law forbids the removal of individuals to countries where they would face a likelihood of persecution or torture. *See* 8 U.S.C. 1158, 1231(b)(3); 8 C.F.R. 1208.13, 1208.16. Plaintiffs/Petitioners are entitled to file a motion to reopen their removal proceedings, and to receive a decision on that motion, because they seek "[t]o apply or reapply for asylum or withholding of deportation based on changed circumstances arising in the country of nationality or in the country to which deportation has been ordered." 8 CFR 1003.2(c)(3)(ii). Plaintiffs/Petitioners are also entitled to file a motion to reopen and to receive a decision on that motion with respect to their new claims of protection under the Convention Against Torture.

11.     In light of recent escalating violence against Westernized Somalis returned from the United States, the Board of Immigration Appeals (BIA) has reopened final removal orders. In the unpublished decision dated December 5, 2017, *In re A-A-S-*, the BIA granted reopening to a man who was detained by ICE and was scheduled to be removed on the December 7 flight to Somalia. *See* BIA Decision in *A-A-S-*, Attached to Motion for Temporary Restraining Order.

12.     Yet despite the clear danger that Plaintiffs/Petitioners and the class they represent now face in Somalia, ICE is attempting to deport them based on removal orders that do not take account of the danger created by the media coverage of the December 7 flight and recent escalation of violence in Somalia--facts that qualify as intervening changed circumstances which entitle Plaintiffs/Petitioners and the others in the class to protection.

13.     In addition, Plaintiffs/Petitioners and the class face imminent removal without assurances that, this time, the Defendants/Respondents will be treated humanely and not abused during the flight and without having received adequate medical treatment for injuries sustained on the last flight.

14.     On the December 7 flight, ICE and U.S. government contract workers forced Plaintiffs/Petitioners to stay seated and chained at their wrists, ankles, and waists for the entire flight.

15.     They denied Plaintiffs/Petitioners and the class movement to stretch and relieve swollen and numb legs and arms.

16.     The flight lasted over 40 hours, including 23 hours while the plane was on the ground in Dakar, Senegal.

17.     When the flight was in Dakar for 23 hours, ICE officers and contract guards beat, kicked, choked, pushed, straightjacketed, threatened to kill, and berated people on the plane. ICE and contract guards also denied Plaintiffs/Petitioners and the others bathroom use, forcing people to try to urinate in bottles or on themselves.

18.     Plaintiffs/Petitioners and class members sustained severe and ongoing injuries as a result of the abuse by ICE officers and contract guards.

19.     By restraining Plaintiffs/Petitioners, abusing them, and creating a hostile environment of coercion and intimidation, ICE and U.S. government contract workers terrified Plaintiffs/Petitioners, and the others on the plane, and forced them to go without sleep for the duration of the flight.

20.     After people on the flight spoke to the U.S. news media about their mistreatment, ICE issued the following statement regarding the flight:

> Upon landing for a refueling and pilot exchange at Dakar, Senegal, ICE was notified that the relief crew was unable to get sufficient crew rest due to issues with their hotel in Dakar. The aircraft, including the detainees and crew on board, remained parked at the airport to allow the relief crew time to rest. During this time, the aircraft maintained power and air conditioning, and was stocked with sufficient food and water. Detainees were fed at regular intervals to include the providing of extra snacks and drinks. Lavatories were functional and serviced the entire duration of the trip. The allegations of ICE mistreatment onboard the

Somali flight are categorically false. No one was injured during the flight, and there were no incidents or altercations that would have caused any injuries on the flight.

21.     In its statement, Defendants/Respondents falsely claim that there were "no incidents or altercations" or injuries and that the bathrooms "were functional and serviced the entire duration of the trip."

22.     In fact, there were numerous "incidents" and "altercations" and "injuries" on the trip. ICE and the contract guards injured people on their heads, arms, legs, and eyes. *See* Declarations of Plaintiffs, Attached to Motion for Temporary Restraining Order. Many of those injured have not yet received adequate medical treatment.

23.     Plaintiffs/Petitioners and class members also did not have access to bathrooms during the trip because ICE officers and contract guards denied them access as punishment and because the toilet tanks became full of human waste and the bathrooms could not be used. *Id*.

24.     ICE does not deny that Plaintiffs/Petitioners and the others on the plane were chained at their wrists, waists, and legs and forced to stay in their seats on the plane for the duration of the flight, including the 23 hours when the flight was on the ground at Dakar.

25.     All of the people with removal orders who were on the December 7 plane were black and the vast majority was Muslim.

26.     Plaintiffs/Petitioners and the class they represent ask this Court to issue an order preventing their removal to Somalia until 1) they are afforded a full and fair opportunity to seek reopening of their removal cases; 2) they have received adequate treatment for injuries sustained on the December 7 flight; and 3) Defendants/Respondents have taken adequate measures to ensure that they will not be abused on the next flight, including but not limited to the guarantee that none of the ICE and contract officers on the December 7 flight will be on any new flight.

27.     Plaintiffs/Respondents and the class further request that the Court issue an order 1) forbidding Defendants/Respondents from transferring Plaintiffs/Respondents and the class out of Krome Service Processing Center in Miami, Florida or Glades Detention Center in Moore Haven, Florida; and 2) ordering Defendants/Respondents to return to Krome or Glades anyone who has already been transferred. Transferring Plaintiffs/Petitioners away from undersigned counsel will make it difficult, if not impossible, for undersigned counsel to represent them. Many, if not most, of Plaintiffs/Petitioners are unrepresented and undersigned counsel is their only hope of securing assistance.

## STATEMENT OF EMERGENCY

28.     This case is an emergency because ICE has stated its intention to put Plaintiffs and class members on another contract flight to Somalia *on Wednesday, December 20, 2017*. ICE intends to take this action without giving Plaintiffs/Petitioners and the class the opportunity for process to determine if they are entitled to protection based on the changed circumstances created by the December 7 flight, without ensuring that they have been given adequate medical treatment for their injuries, and without assurances that they will not be harmed again during the flight.

## VENUE

29.     Venue for the complaint for injunctive and declaratory relief and damages is proper under 28 U.S.C. § 1391(e), as Defendants/Respondents are officers or employees of the United States. Venue for the habeas action is proper under 28 U.S.C. §§ 2241 *et seq*., as Respondents exercise control over Plaintiffs/Petitioners' custody.

## JURISDICTION

30.     This case arises under the United States Constitution; the Immigration and

Nationality Act (INA), 8 U.S.C. §§ 1101 *et seq.*; the regulations implementing the INA's asylum provisions; the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), Dec. 10, 1984, S. Treaty Doc. 100-20 (1988), 1465 U.N.T.S. 85; the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), 8 U.S.C. § 1231; and the Administrative Procedure Act (APA), 5 U.S.C. §§ *et seq.*

31.     This Court has habeas corpus jurisdiction pursuant to 28 U.S.C. §§ 2241 *et seq.*, and Art. I § 9, cl. 2 of the United States Constitution (Suspension Clause). This Court may also exercise jurisdiction pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 1361 (mandamus statute); 5 U.S.C. §§ 701 *et seq.* (Administrative Procedures Act); Art. III of the United States Constitution; Amendment V to the United States Constitution; and the common law.

32.     This Court may grant relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, and the All Writs Act, 28 U.S.C. § 1651, and has the ability to enjoin federal officials pursuant to *Ex Parte Young*, 209 U.S. 123 (1908). *See Philadelphia Co. v. Stimson*, 223 U.S. 605, 619-21 (1912) (applying *Ex Parte Young* to federal official); *Goltra v. Weeks*, 271 U.S. 536, 545 (1926) (same). The Court also has jurisdiction to determine its own jurisdiction. *United States v. United Mine Workers of Am.*, 330 U.S. 258, 290 (1947).

## PARTIES

### Plaintiffs

33.     Plaintiff/Petitioner **Farah Ali IBRAHIM** was born in Somalia on December 15, 1987.

34.     Plaintiff/Petitioner Ibrahim is currently detained at Krome Processing Center in Miami, Florida.

35.     Plaintiff/Petitioner Ibrahim came to the United States approximately two years ago and has been seeking asylum, without the assistance of an attorney, while in ICE custody since his arrival.

36.     Plaintiff/Petitioner Ibrahim was denied asylum on February 2, 2017 and the Board of Immigration Appeals dismissed his appeal June 22, 2017.

37.     Plaintiff/Petitioner Ibrahim was on the December 7 flight. Defendants shackled him with chains on his wrists, waist and legs and forced him to stay seated for almost two days.

38.     He suffered the following additional physical abuse aboard the plane when it was on the ground in Senegal:

a) Plaintiff/Petitioner Ibrahim was dragged by the shirt collar along the floor of the plane by an ICE officer to another part of the plane.

b) Another ICE officer kicked Plaintiff/Petitioner Ibrahim on the head and stepped on his hand.

c) Two officers stepped on Plaintiff/Petitioner Ibrahim back.

d) An officer pressed his thumb under Plaintiff/Petitioner Ibrahim's ear near his jaw and, shoved his head into the floor, causing him to lose consciousness.

39.     When Plaintiff/Petitioner Ibrahim regained consciousness after the assault, he found that agents had immobilized his body by wrapped him in fabric and applied cord restraints that prevented from sitting upright or standing.

40.     Because of the physical assault at the hands of the agents, Plaintiff/Petitioner Ibrahim continues to suffer pain in his hand, back, and forehead.

41.     Plaintiff **Ibrahim MUSA** was born on June 14, 1969 in Somalia.

9

42.     Plaintiff/Petitioner Musa is currently detained at Krome Processing Center in Miami, Florida.

43.     Plaintiff/Petitioner Musa left Somalia at the age of 21 during the civil war.

44.     Plaintiff/Petitioner Musa has been residing in the United States for twenty years and has four U.S. citizen children aged 19, 16, 12, and 9 and a wife who is a lawful permanent resident and eligible to naturalize to become a U.S. citizen.

45.     Plaintiff/Petitioner Musa applied for asylum but did not have a lawyer for most of his case.

46.     Plaintiff/Petitioner Musa was denied asylum in May 17, 2000, and the Board of Immigration Appeals dismissed his appeal on December 11, 2002.

47.     Plaintiff/Petitioner Musa was detained by ICE agents when he complied with ICE instructions and appeared for his annual Order of Supervision ICE appointment.

48.     While aboard the ICE plane, Plaintiff/Petitioner Musa's handcuffs were attached to his waist and his legs were shackled together.

49.     Because of the manner in which Plaintiff/Petitioner Musa was shackled and restrained, his shoulders ached and he could not move causing his leg to become was numb.

50.     Because of the way Plaintiff/Petitioner Musa was physically abused on the plane, his body still hurts to this day.

51.     Because of his twenty years in the United States, Plaintiff/Petitioner Musa now speaks with an American accent and he has become Westernized.

52.     Plaintiff/Petitioner Musa fears returning to Somalia, a country he does not have any ties to, where his American and Western characteristics will be apparent to Al Shabaab. Al Shabaab targets Westerners, like Plaintiff/Petitioner Musa, who are viewed as traitors.

53.    Plaintiff/Petitioner Musa believes news of this aborted flight has reached the general Somali public. He believes that having been on the December 7 flight jeopardizes his safety upon his return, and he believes that al-Shabaab will kill him for being a Westernized Somali.

54.    Plaintiff **Khalid Abdallah MOHAMED** was born on December 17, 1986 in Somalia. Mr. Mohamed is thirty-one.

55.    Plaintiff/Petitioner Mohamed is currently in custody at Krome Processing Center in Miami, Florida.

56.    Plaintiff/Petitioner Mohamed has been in ICE custody since he arrived in the United States and requested asylum on or about August 18, 2016.

57.    Plaintiff/Petitioner Mohamed passed a credible fear interview at the U.S.-Mexico border after he presented himself to Immigration officials.

58.    Plaintiff/Petitioner Mohamed was denied asylum on February 16, 2017. His appeal was dismissed July 13, 2017.

59.    Plaintiff/Petitioner Mohamed was on the December 7 plane.

60.    Defendants shackled Plaintiff/Petitioner Mohamed with chains on his wrists, waist and legs and forced him to stay seated for almost two days.

61.    Plaintiff/Petitioner Mohamed witnessed a guard attack another Somali man on the plane. The guard wrapped the man in full body restraints to prevent him from moving for hours, to make an example of him.

62.    ICE threatened Plaintiff/Petitioner Mohamed and others sitting near him.

63.    ICE threatened to force Plaintiff/Petitioner Mohamed and others into the full body restraint if they did not stay seated.

64.    Plaintiff/Petitioner Mohamed fears returning to Somalia where he fears he will be killed by al-Shabaab.

65.    Plaintiff **Ismail JIMCALE ABDULLAH** was born on March 10, 1989 in Somalia. He is 28 years old.

66.    Plaintiff/Petitioner Jimcale Abdullah is currently detained at Krome Processing Center in Miami, Florida.

67.    Plaintiff/Petitioner Jimcale Abdullah came to the United States with his wife. Plaintiff/Petitioner Jimcale Abdullah's wife's asylum claim is ongoing in Texas. She resides in Texas with their one-year-old U.S. citizen son.

68.    Plaintiff/Petitioner Jimcale Abdullah fled al Shabaab in Somalia, a terrorist organization that killed his father and threatened his family.

69.    Plaintiff/Petitioner Jimcale Abdullah was denied asylum while he was in ICE detention on June 20, 2017. He did not have a lawyer and did not file an appeal.

70.     Plaintiff/Petitioner Jimcale Abdullah was on the December 7 plane.

71.    Defendants/Respondents shackled him with chains on his wrists, waist and legs and forced him to stay seated for almost two days.

72.    While on the plane, Plaintiff/Petitioner Jimcale Abdullah suffered a severe headache and his requests for medication were denied.

73.    Plaintiff Plaintiff/Petitioner Jimcale Abdullah witnessed the following:

a)    ICE officers forcibly pushed people onto the ground and plane seats.

b)    ICE officers stomped on people.

c)    ICE officers chained people to seats.

d)    People were injured on the plane.

74.     Plaintiff Plaintiff/Petitioner Jimcale Abdullah heard ICE threaten to kill people if they did not sit.

75.     Plaintiff Plaintiff/Petitioner Jimcale Abdullah only wants to be reunified with his wife and his U.S. citizen infant child.

76.     Plaintiff Plaintiff/Petitioner Jimcale Abdullah fears al Shabaab will come after him for being on the flight and for living in the United States because al-Shabaab kills people perceived to support America.

77.     Plaintiff **Abdiwali Ahmed SIYAD** was born on October 15, 1984 in Somalia. He is thirty-three years old.

78.     Plaintiff/Petitioner Siyad is currently detained at Glades Detention Center in Moore Haven, Florida.

79.     Plaintiff/Petitioner Siyad left Somalia in 1990 when he was a child.

80.     While still in Somalia, at age 4, Plaintiff/Petitioner Siyad was struck by a bullet and lost an eye and was stabbed in the leg. Terrorist groups killed some of his brothers in Somalia.

81.     Plaintiff/Petitioner Siyad has a U.S. citizen child and U.S. citizen siblings in the United States.

82.     Plaintiff/Petitioner Siyad has never had the help of a lawyer in his immigration case. On December 13, 2012, Mr. Siyad lost his immigration case. He did not file an appeal.

83.     Plaintiff/Petitioner Siyad was present on the December 7 flight.

84.     Defendants/Respondents shackled him with chains on his wrists, waist and legs and forced him to stay seated for almost two days.

85.     A guard on the plane struck Plaintiff/Petitioner Siyad in the face.

86.     A guard on the plane shoved Plaintiff/Petitioner Siyad into his seat twice.

87.     Guards on the plane prohibited him from praying.

88.     Plaintiff/Petitioner Siyad vomited on the plane.

89.     Plaintiff/Petitioner Siyad suffers from depression and takes medication for treatment.

90.     ICE refused Plaintiff/Petitioner Siyad requests for his antidepressant medication on the plane.

91.     Plaintiff/Petitioner Siyad witnessed the following on the plane:

a)     Plaintiff/Petitioner Siyad witnessed ICE guards push and punch a Somali man.

b)     Plaintiff/Petitioner Siyad saw a guard on the plane roll Somali men in restraints "like burritos" to entirely prevent them from moving.

92.     Plaintiff/Petitioner Siyad heard the following:

a)     He heard people screaming and asking ICE to get off their shackles.

b)     ICE threatened him and told him to stay seated or he would be responsible for what will happen to him.

93.     Plaintiff/Petitioner Siyad fears that his government can't protect him.

94.     Al-Shabaab has taken Plaintiff/Petitioner Siyad's family's property and homes in Somalia. He no longer has ties in Somalia.

95.      Plaintiff **Ismael Abdirashed MOHAMED** was born on January 3, 1992 in Somalia.  He is twenty-five.

96.     Plaintiff/Petitioner Abdirashed Mohamed is currently detained at Glades County Detention Center in immigration custody.

14

97.     Plaintiff/Petitioner Abdirashed Mohamed fled Somalia in 2000 when he was eight years old. His father and girlfriend are U.S. citizens and reside in Sioux City, Iowa.

98.     Plaintiff/Petitioner Abdirashed Mohamed pursued his immigration case by himself because he could not afford a lawyer. He lost his case on June 8, 2017. He did not file an appeal.

99.     Plaintiff/Petitioner Abdirashed Mohamed was on the December 7 plane.

100.    Defendants/Respondents shackled him with chains on his wrists, waist and legs and forced him to stay seated for almost two days.

101.    On the plane, Plaintiff/Petitioner Abdirashed Mohamed asked to use the restroom and ICE stepped on his ankle shackles and poked him in the eye.

102.    Plaintiff/Petitioner Abdirashed Mohamed's eye is still damaged and his vision is extremely blurry.

103.    The eye drops he received at Glades County Detention Center have not helped.

104.    Plaintiff/Petitioner Abdirashed Mohamed fears he will never be able to see out of his eye normally again.

105.    Plaintiff/Petitioner Abdirashed Mohamed witnessed ICE slam two Somali men with their bodies.

106.    Plaintiff/Petitioner Abdirashed Mohamed witnessed ICE punch a man and throw him on the floor.

107.    Plaintiff/Petitioner Abdirashed Mohamed witnessed ICE wrap others in blanket restraints to prevent movement.

108.    Plaintiff/Petitioner Abdirashed Mohamed witnessed that ICE prohibited regular bathroom use on the plane.

109.   Plaintiff/Petitioner Abdirashed Mohamed held his urine for several hours out of fear of being assaulted.

110.   When Plaintiff/Petitioner Abdirashed Mohamed was able to relieve himself, he experienced pain in his bladder that continues to hurt today.

111.   Plaintiff/Petitioner Abdirashed Mohamed fears returning to Somalia.

112.   Plaintiff **Khadar Abdi IBRAHIM** was born in Somalia on March 10, 1987. He is thirty years old. His U.S. citizen sister lives in Minneapolis, Minnesota, along with other members of his family.

113.   Plaintiff/Petitioner Ibrahim is currently detained at Glades County Detention Center.

114.   Plaintiff/Petitioner Ibrahim lost his immigration case on July 28, 2008 in Texas. He did not have a lawyer to help him with his case. He did not file an appeal.

115.   Plaintiff/Petitioner Ibrahim left Somalia in 1989 because of the civil war. His father was murdered and his aunt was raped.

116.   Plaintiff/Petitioner Ibrahim was on the December 7 plane. Defendants shackled him with chains on his wrists, waist and legs and forced him to stay seated for almost two days.

117.   On the plane, Plaintiff/Petitioner Ibrahim stood up to use the bathroom and an ICE officer picked him up by his waist and slammed him down head-first with his legs in the air. His neck still hurts today.

118.   Plaintiff/Petitioner Ibrahim witnessed ICE choke and punch two other men.

119.   Plaintiff/Petitioner Ibrahim saw another man bleeding from his lips after ICE had choked him.

120.    Plaintiff/Petitioner Ibrahim witnessed ICE wrap a man in an immobilizing restraint.

121.    Plaintiff/Petitioner Ibrahim heard ICE threaten to wrap others in restraints.

122.    Plaintiff/Petitioner Ibrahim has many tattoos and fears he will be murdered in Somalia by Al Shabaab because he is Westernized in appearance.

### Defendants

123.    Defendant/Respondent Juan Acosta is Assistant Field Office Director of ICE's Miami Field Office and is sued in his official capacity. Mr. Acosta has responsibility for and authority over the detention centers where Plaintiffs/Petitioners are detained. He is an immediate custodian of Plaintiffs/Petitioners.

124.    Defendant/Respondent David Hardin is the Sheriff of Glades County, one of the detention centers where Plaintiffs/Petitioners are being held in immigration detention. He is an immediate custodian of Plaintiffs/Petitioners.

125.    Defendant/Respondent Marc J. Moore is the Director of ICE's Miami Field Office and is sued in his official capacity. The Miami Field Office Director has responsibility for and authority over the detention and removal of noncitizens in Florida, and is their immediate custodian for purposes of habeas corpus. Respondent/Defendant Moore has the power or ability to produce Plaintiff/Petitioners detained in Florida if directed to do so by this Court.

126.    Defendant/Respondent Thomas Homan is the Acting Director of ICE and is sued in his official capacity. The Acting Director of ICE has responsibility for and authority over the detention and removal of noncitizens throughout the United States. Mr. Horman also qualifies as the appropriate habeas respondent for all Petitioners and class members to the extent that Petitioners have been transferred out of Florida. Defendant/Respondent Homan has the power or

17

ability to produce petitioners located anywhere in the United States if directed to do so by this Court, and this Court has personal jurisdiction over him. *See Straight v. Laird*, 406 U.S. 341, 345 n.2 (1972).

127.    Defendant/Respondent Kirstjen Nielsen is the Secretary of Homeland Security and is sued in her official capacity. Mr. Homan reports to Secretary Nielsen, who therefore has supervisory responsibility for and authority over the detention and removal of noncitizens throughout the United States.

## STATEMENT OF FACTS

128.    Petitioners and class members are 92 individuals ordered removed to Somalia who ICE detained and attempted to fly to that country on a plane that left Louisiana on December 7, 2017.

129.    The flight never reached its destination, and was forced to return to the United States over 48 hours later, on December 9.

130.    For more than two days, ICE agents subjected Petitioners to inhumane conditions and mistreatments including acts of serious physical violence that resulted in still untreated injuries.

131.    ICE's egregious misconduct before and during the flight has generated extraordinary attention in the international media, and the attention has only become more intense because ICE continues to cover up the truth by releasing a statement about the flight that contains false statements.

132.    The level of media interest ICE has brought upon Plaintiffs/Petitioners while debasing them on this flight is without precedent, and the story has been followed closely within Somalia.

133.     Because of the attention ICE has brought upon Plaintiffs/Petitioners inside Somalia, together with very recent escalations of Al Shabaab violence, Plaintiffs/Petitioners, and the class they represent, now face a unique and elevated risk of being persecuted, tortured or killed in Somalia, including by the fundamentalist group Al Shabaab.

134.     These new circumstances wrought by the December 7 flight and the recent escalation in Al Shabaab violence constitute critical changed facts, entitling Plaintiffs/Petitioners to additional process to challenge their removal orders.

### BACKGROUND ON CONDITIONS IN SOMALIA

135.     Somalia's civil war in the early 1990s destroyed the country and left it without any functioning government for two decades.

136.     Somalia's recent effort to rebuild a central government is fragile at best. The U.S. Departments of Homeland Security and State conducted their own "thorough review of conditions in Somalia" and concluded in 2017 that the country "continues to experience an ongoing armed conflict[,]" in which "Al-Shabaab controls large swaths of territory in southern Somalia and conducts frequent asymmetric attacks on military and civilian targets in government-controlled areas."

137.     The United States is taking an active part in the war against Al Shabaab inside Somalia. In 2014, a U.S. drone strike killed Al Shabaab leader Ahmed Abdi Godane, and this caused the group to redirect its efforts towards terrorist attacks upon civilian targets, especially those it perceives as Western or American.

138.     During the same period of months when ICE targeted Petitioners for detention and removal conditions deteriorated in Somalia. Al Shabaab's attack on Western targets inside Somalia continued during 2017, and then came the historic bomb blast in Mogadishu of October

14, 2017, which killed over 500 people. *See* Harper Decl. at 23, Attached to Motion for Tempoary Restraining Order. In turn, the U.S. military has now undertaken a campaign of bombings against Al Shabaab.  NYT. This development portends further escalations by Al Shabaab against persons perceived to be American or Westernized.

### U.S. DEPORTATIONS TO SOMALIA

139.   Against this backdrop, and until recently, only a tiny number of the approximately 4800 Somali nationals with outstanding orders of removal who live in the United States were ever actually removed to Somalia. *See* Harper Declaration, Attached to Motion for Tempoary Restraining Order.

140.   During the years Somalia had no government ICE removed only a handful of individuals. ICE placed almost all Somalis who were legally subject to removal under Orders of Supervision (OSUPs) that provided them authorization to work and required only periodic check-ins with ICE, often just one time per year or every six months.

141.   Even after a new Somali government took shape, removals remained extremely rare. For example, in fiscal years 2012 and 2013 there were only 31 removals to Somalia in each year.

142.   When ICE did enforce a removal order, its agents would escort the Somali national on a commercial flight, without shackles. The rest of the thousands of Somalis with OSUPs continued to live otherwise normal lives in the United States with their families.

143.   It was not until the very end of 2016 and into 2017 that ICE sought for the first time to detain and then remove Somalis in larger numbers using charter flights.

144.    ICE deported 198 Somalis in 2016 and that figure more than doubled to 521 in 2017, even as the overall rate of all ICE removals for all nationalities declined during the same period.

145.    Plaintiffs/Petitioners, many who lived for years with orders of supervision, have been caught up in ICE's sudden move to dramatically increase removals to Somalia.

## THE DECEMBER 7 FLIGHT

146.    Just on the heels of deteriorating conditions in Somalia, ICE opted to move forward and remove Plaintiffs/Petitioners and the class they represent.

147.    ICE transferred Plaintiffs/Petitioners to its detention facilities in Louisiana, where many were isolated from family and counsel.

148.    In the very early morning of December 7, 2017, around 1:00-3:00 am, ICE officers woke up the 92 Somali men and women and shackled them.

149.    ICE chained their wrists and waists in metal cuffs and tethered their wrists to their waists. ICE separately bound their legs.

150.    ICE chained people hours before they boarded the flight.

151.    When it was time for the flight to depart, ICE tightened the shackles of the men and women and marched them to the plane. ICE put some people in restraint masks.

152.    ICE's use of shackles and other forms of force is governed by the 2011 Performance-Based National Detention Standards, revised in 2016. It provides as follows:

a.      Detainees subjected to use of force receive medical attention "as soon as possible."

b.      Approval from a Facility Administrator is required for ongoing use of restraints.

21

    c.      Restraints must be removed when a detainee is no longer a danger to himself or others.

    d.      Medical or mental health staff must be consulted before force is applied to a detainee with "physical, intellectual, and developmental disabilities, and detainees with a mental health condition that may impair their ability to understand the situation."

    e.      Medical staff must review the medical file for a detainee prior to use of force.

    f.      Shift supervisor must check the physical status of a detainee in restraints every two hours.

    g.      Restraints worn properly will not restrict blood circulation or breathing.

153.    The following conduct is prohibited by the ICE 2011 PBNDS:

    a.      Use of restraints as a tool to lift or carry detainees.

    b.      The use of restraints to cause "physical pain or extreme discomfort."

    c.      Restraints that are "unnecessarily tight."

    d.      Use of choke holds.

    e.      Use of neck restraints or carotid holds.

154.    ICE officers and contract guards violated these standards regarding the use of shackles and other forms of force on the December 7 flight.

155.    Numerous ICE and contract guards, as many as 20 or 30, were on the December 7 flight.

156.    The women and men were shackled on the plane and were instructed to remain seated.

157.    The plane flew to Dakar, Senegal and landed for refueling. ICE claimed that while the plane was on the ground there was a mechanical problem.

158.    ICE told the men and women that the plane needed to be fixed and that they would have to wait 15 hours for a part to be flown in from the United States.

159.    For the next 23 hours, the plane remained grounded at Dakar airport.

160.    During this entire time, without a break, Plaintiffs and the class remained shackled at their wrists, waist, and legs.

161.    The guards did not loosen the shackles, even when the deportees told them that the shackles were painful because they were too tight, that their arms and legs were swollen and were bruised.

162.    The guards did not permit the men and women to get off of the plane, to stand up, or to stretch and walk around. The guards ordered the men and women to stay in their seats and used force to push people down who stood up, even if they stood up to ask a question or to try and use the bathroom.

163.    The guards started to physically abuse people using extreme force. Guards punched and kicked people, choked them, stepped on their shackles, and threw them on the floor, drawing blood and causing injury. People were placed in straight jackets and turned upside down. ICE and the contract guards abused people to intimidate others on the plane.

164.    Plaintiffs/Petitioners and class members have injuries that have not healed and that have not been given adequate medical treatment.

165.    In addition to the physical abuse, guards yelled at the people on the plane, berating them for being deportees, calling them criminals, and threatening to kill them.

166.    ICE officers and contract guards denied people their medications, including people with diabetes and the HIV virus.

167.    ICE and the contract guards deprived people of the bathroom. Some people were prevented from using the bathroom as a form of punishment.

168.    During the trip, the bathroom toilets became full of human waste and could not be used.

169.    Deportees were forced to try and urinate in water bottles and on themselves.

170.    After 23 hours in Dakar, the flight returned to the United States. The plane was not able to proceed to its next scheduled stop, Djibouti.

171.    The plane landed in Miami, Florida on or about Saturday, December 9, 2017.

172.    In total, the trip lasted about 48 hours. Plaintiffs/Petitioners and class members were shackled the entire time, in addition to the time they spent shackled prior to being transported to the plane.

173.    Plaintiffs/Petitioners and the class members they represent were all detained in Florida upon arrival. All of Plaintiffs/Petitioners and most of the class members are currently detained in Florida at Krome Service Processing Center and Glades County Detention Center.

**INCREASED DANGER DUE TO THE DECEMBER 7 FLIGHT**

174.    ICE's ill-conceived and inhumane attempt to fly Plaintiffs/Petitioners into a war zone failed.

175.    The horrific details of how ICE treated them on the December 7 plane reached Somalia on a wave of international media coverage about the incident, including The New York Times, Newsweek and multiple Somali news sources. *See* Somali News Articles, Attached to Motion for Temporary Restraining Order.

176.    This media has driven intense public attention to the Plaintiffs/Petitioners and their connections to the United States inside Somalia.

177.    This media, together with very recent escalations in anti-Western terrorist violence, constitute unique, changed circumstance because it puts Plaintiffs/Petitioners and the class in danger of being targeted by the anti-American, anti-Western terrorist organization, Al Shebaab.

178.    Al Shabaab targets people who are returning to Somalia after having been in the United States as enemies of their cause who must be summarily executed. *See* Hunter Decl., Attached to Motion for Temporary Restraining Order. The United States has recognized that Al Shabaab's violent attacks on people it deems enemies have caused what the United States has declared to be "one of the worst humanitarian crises in the world."   82 FR 4907 (renewing Temporary Protected Status to certain Somalis in the United States based on the severe level of danger).

179.    Further compounding the danger facing the Plaintiffs/Petitioners is the fact that the December 7 flight occurred just weeks after Al Shabaab's carried out a massive bomb attack in Mogadishu on October 14, 2017, killing over 500 people. The gravity and importance of this bombing this attack is reflected in how it is referred to as "Somalia's 9/11."

180.    The October 14th attack prompted the United States to launch bombing raids against Al Shabaab inside Somalia in November of this year.

181.    The severe and very recent escalation of Al Shabaab's terrorist violence, coupled with the U.S. military's retaliation, are additional new circumstances that add to the risk facing Plaintiffs/Petitioners triggered by the aborted and abusive December 7 flight.

182.    Plaintiffs/Petitioners face imminent removal to Somalia, where they will likely be killed or harmed due to changed circumstances in Somalia created by the media coverage and notoriety of the aborted and abusive December 7 flight, together with the very recent escalation of Al Shabaab anti-Western violence.

## LEGAL FRAMEWORK

183.    Consistent with U.S. obligations under the Refugee Act and the Convention Against Torture (CAT), the Immigration and Nationality Act prohibits the United States from removing a noncitizen to a country where he or she is more likely than not to face persecution or torture.

184.    The statute contains a mandatory prohibition on removing noncitizens to a country where their life or freedom would be threatened on the grounds of race, religion, nationality, membership in a particular social group or political opinion. 8 U.S.C. § 1231(b)(3). Apart from certain limited exceptions, any individual who can demonstrate that it is more likely than not that he or she will be persecuted on one of the five protected grounds, is entitled to this statutorily mandated protection. *See INS v. Stevic*, 467 U.S. 407 (1984) (holding that alien is entitled to relief from deportation if he is more likely than not to face persecution on one of the specified grounds following his deportation).

185.    The other prohibition on removal tracks the Convention Against Torture's prohibition on removal of noncitizens to countries where they would face torture. *See* 8 C.F.R. §§ 208.16-18 (implementing the Convention Against Torture's provisions with regard to withholding of removal); Foreign Affairs Reform and Restructuring Act (FARRA), Pub. L. No. 105-277, Div. G., Title XXII, § 2242, 112 Stat. 2681-822 (Oct. 21, 1998) (codified as Note to 8 U.S.C. § 1231); U.N. Convention Against Torture and Other Forms of Cruel, Inhuman or

Degrading Treatment or Punishment, art. 1, para. 1, opened for signature Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1998), 1465 U.N.T.S. 85.

186.    Under the CAT, an individual may not be removed if "it is more likely than not that [the individual] would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). The regulations provide for both withholding of removal under CAT and "deferral of removal." Withholding of removal is subject to the same exceptions as apply to 8 U.S.C. § 1231(b)(3), deferral of removal contains no exceptions for people with "particularly serious crimes." *Compare* 8 C.F.R. § 208.16(d)(3) *with* 8 C.F.R. § 208.17.

187.    Plaintiffs/Petitioners may also be eligible for asylum. *See* 8 U.S.C. § 1158. Asylum is a discretionary form of relief from persecution that is available to noncitizens who can demonstrate that they have a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). To prevail on an asylum claim, an applicant need only show that there is a ten percent chance that he or she will be persecuted on account of an enumerated ground. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 439-40 (1987).

188.    Noncitizens who have been ordered removed have the statutory right to file motions to reopen their cases, which are governed by certain time and numerical requirements. *See* 8 U.S.C. § 1229a(c)(7). But the statute recognizes the unique nature of applications for protection from persecution and torture. If the noncitizen is seeking asylum, withholding, or protection under CAT based "on changed country conditions arising in the … country to which removal has been ordered," the statute permits the noncitizen to file a motion to reopen at any time. 8 U.S.C. § 1229a(c)(7)(C)(ii); *see also* 8 C.F.R. § 1003.2(c)(3)(ii).

189.   The exception to the numerical and time limits provides a critical "safety valve" for bona fide refugees who would otherwise be deported from the United States in violation of U.S. international treaty obligations of non-refoulement. *See Salim v. Lynch*, 831 F.3d 1133, 1137 (9th Cir. 2016) ("Judicial review of a motion to reopen serves as a 'safety valve' in the asylum process …. Such oversight 'ensure[s] that the BIA lives by its rules and at least considers new information' bearing on applicants' need for and right to relief." (citing *Pilica v. Ashcroft*, 388 F.3d 941, 948 (6th Cir. 2004)).

190.   In addition, the Due Process Clause and the INA grant Plaintiffs/Petitioners the right to counsel to challenge their removal, and to a fair hearing proceeding before they are removed from the country. 8 U.S.C. § 1362; *Leslie v. Attorney General*, 611 F.3d 171, 181 (3d Cir. 2010) (holding that the Fifth Amendment and immigration statute affords a noncitizen right to counsel of her own choice); *Amadou v. INS*, 226 F.3d 724, 726-27 (6th Cir. 2000) (noting that noncitizens have "due process right to a full and fair hearing").

191.   Both ICE's due process obligations and the INA abridge the government's discretion to transfer detainees, if the transfer interferes with the detainees' access to counsel. *See Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 565-66 (9th Cir. 1990) (affirming injunction enjoining INS from transferring detainees in manner that inferred with existing attorney-client relationships). Such transfers are unlawful when they interfere with detainees' constitutional, statutory and regulatory rights seek relief from persecution and obtain counsel of their choosing. *See Louis v. Meissner*, 530 F. Supp. 924, 927 (S.D. Fla. 1981) (finding INS had thwarted detainees' statutory and regulatory rights to representation in exclusion proceedings by transferring them to remote areas lacking counsel and interpreters).

192.    Plaintiffs/Petitioners, on their behalf and on behalf of the class they seek to represent, request: 1) a temporary restraining order that prohibits Defendants from deporting Plaintiffs and the class they represent; and 2) a permanent injunction against Defendants prohibiting them from deporting Plaintiffs/Petitioners and the class they represent until: a) they are afforded a full and fair opportunity to seeking reopening of their removal cases; b) they have received adequate treatment for their injuries sustained on the December 7 flight; and c) Defendants/Respondents have taken precautions to ensure that Plaintiffs and the class they represent will not be again abused during the deportation process, including but not limited to assurances that none of the same ICE or contract agents that were on the December 7 flight will be on the next flight.

## CLASS ACTION ALLEGATIONS

193.    Plaintiffs/Petitioners seek class-wide injunctive relief pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3).

194.    Plantiffs/Petitioners seek to certify the class: All persons with final orders of removal and currently facing removal to Somalia who are located within the jurisdiction of the Miami ICE Field Office ("Class Members"), including all persons whom ICE sought to deport to Somalia on the December 7, 2017 contract flight ("Subclass Members").

195.    The class meets the numerosity requirement of Rule 23(a)(1), as there were 92 individuals on the December 7 flight and other individuals who face removal to Somalia on the next flight in the Miami Field Office jurisdiction.

196.    The class meets the commonality requirement of Rule 23(a)(2). Questions of law and fact presented by Plaintiffs/Petitioners' cases are common to other members of the class. The common contentions that unite the claims of the class are that each member has a final order of

removal, ICE is seeking to deport each class member to Somalia, and each class member has the same basis for a motion to reopen their removal order based on changed circumstances arising from the December 7 flight.

197.    Plaintiffs/Petitioners' claims are typical of those of the class because they all have final orders of removal are eligible to file motions to reopen their removal orders based on changed circumstances due to the December 7 flight.

198.    Plaintiffs/Petitioners will fairly and adequately protect the interests of the class because they, like all class members, have final orders of removal and face removal to Somalia.

199.    Class counsel has experience in immigration-related class action cases and will adequately represent the interests of the class.

200.    The proposed class satisfies the requirements of Rule 23(b)(2) for the injunctive relief sought, as Defendants/Respondents have acted on grounds generally applicable to the class, making equitable relief appropriate as to the class as a whole.

201.    Individual suits by each member of the class would be impracticable because they would create a risk of inconsistent or varying adjudications and would establish incompatible standards of conduct for the parties opposing the class. In addition, the class members are all detained and indigent and lack the financial resources to vindicate their rights in Court.

## CAUSES OF ACTION

### COUNT I:
### Prohibition On Removal To Country Where Individual Would
### Face Persecution Or Torture

202.    Plaintiffs/Petitioners reallege the foregoing paragraphs as if set forth fully herein.

203.    Pursuant to the INA, and to ensure compliance with international treaties for which it is a signatory, the U.S. government is prohibited from removing noncitizens to countries

where they are more likely than not to face persecution or torture.

204.     The prohibition on removal is mandatory for anyone who satisfies the eligibility criteria set forth in the statute and regulations. In addition, where country conditions change after an individual has been ordered removed, the INA specifically provides for motions to reopen a removal order to review a claim for protection in light of new facts.

205.     Plaintiffs/petitioners, who are facing removal to Somalia based on old removal orders, face persecution and/or torture if removed to that country in light of changed circumstances since their cases were last considered. These changes circumstances are both the risk generated by the abusive and aborted December 7 flight and the recent escalation in anti-Western Al Sabaab violence.

206.     Defendants/Respondents have a mandatory duty under the INA and under the international treaties to which the U.S. is a signatory to determine for each Plaintiff/Petitioner and members of the class whether the individual will face persecution, torture, or death if deported to Somalia.

## COUNT II

### Prohibition On Removal To Country Where Individual Would Face Persecution Or Torture Without Due Process Guaranteed By Constitution

207.     Plaintiffs/Petitioners reallege the foregoing paragraphs as if set forth fully herein.

208.     As persons who are protected by the Due Process Clause, Petitioners have a right to a fair proceeding before they are removed from the country.

209.     Because the danger to Plaintiff/Petitioners in Somalia is based on changed country circumstances, they have not received their core procedural entitlement. They have not had an opportunity to have their claims heard at a meaningful time and in a meaningful manner because their removal orders are based on conditions as they existed before the December 7

31

flight. Removing the Plaintiff/Petitioners without giving them this opportunity violates the Fifth Amendment's Due Process Clause.

210.    Defendants/Respondents have a mandatory duty under the Due Process Clause to determine for each Plaintiff/Petitioner and members of the class whether the individual will face persecution, torture, or death if deported to Somalia.

**COUNT  III**
**Prohibition On Transfer Of Immigration Detainees Away From Counsel**

211.    Plaintiffs/Petitioners reallege the foregoing paragraphs as if set forth fully herein.

212.    In addition to their Due Process Clause rights, pursuant to statute, Plaintiffs/Petitioners have a right to counsel, at no expense to the government, to challenge their removal from the United States. 8 U.S.C. § 1362. Any ICE decision to transfer Plaintiffs/Petitioners away from undersigned counsel violates their statutory right to counsel and their due process right to fair hearing.

**ATTORNEYS' FEES**

213.    Plaintiffs/Petitioners and other members of the proposed class are entitled to reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b).

**RELIEF REQUESTED**

**WHEREFORE,** Plaintiffs/Petitioners respectfully request that this Court enter judgment in their favor and:

a.    Enjoin Defendants/Respondents from deporting Plaintiffs/Petitioners and the class members they represent until 1) they are afforded a full and fair opportunity to seek reopening of their removal cases; 2) they have received adequate medical treatment for their injuries sustained on the December 7 flight; and 3) Defendants/Respondents have taken precautions to ensure that Plaintiffs and the class they represent will not be again abused during the deportation process,

32

including but not limited to assurances that none of the same ICE or contract agents that were on the December 7 flight will be on the next flight.

b.      Enjoin Defendants/Respondents from transferring Plaintiffs/Petitioners and the class members they represent from Krome Service Processing Center, Miami, Florida or Glades Detention Center, Moore Haven, Florida.

c.      Order Defendants/Respondents to return any class members to South Florida who have been transferred to a different location.

f.      Grant any other equitable relief this Court may deem just and proper.

Respectfully submitted,

By: /s/ Rebecca Sharpless
Rebecca Sharpless                                    Benjamin Casper Sanchez*
Florida Bar No. 0131024                            James H. Binger Center for New
Immigration Clinic                                    Americans
University of Miami School of Law            University of Minnesota Law School
1311 Miller Drive Suite E-273                   190 Mondale Hall
Coral Gables, Florida 33146                      229 19th Avenue South
Tel: (305) 284-3576, direct                       Minneapolis, MN  55455
Tel: (305) 284-6092, clinic                        (612) 625-6484
rsharpless@law.miami.edu                       caspe010@umn.edu

Lisa Lehner                                              *Motion to Appear Pro Hac Vice
Florida Bar No. 382191                            Forthcoming
Andrea Crumrine
Americans for Immigrant Justice            Andrea Montavon-McKillip
3000 Biscayne Blvd., Suite 400               Fla. Bar No. 56401
Miami, FL 33137                                      Legal Aid Service of Broward County,
Phone: (305) 573-1106                             Inc.
llehner@aijustice.org                               491 N. State Rd. 7
acrumrine@aijustice.org                          Plantation, FL 33317
                                                            (954) 736-2493
                                                            (954) 736-2484 (fax)
                                                            amontavon@legalaid.org


Law students Mary Georgevich, Alexis Dutt, and Timothy Sanders from the University of Minnesota Law School contributed to this pleading.