# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No.: 17-cv-24574-GAYLES

Farah IBRAHIM, Ibrahim MUSA, Khalid
Abdallah MOHMED, Ismail JIMCALE
ABDULLAH, Abdiwali Ahmed SIYAD, Ismael
Abdirashed MOHAMED, and Khadar Abdi
IBRAHIM, on behalf of themselves and all those
similarly situated,

      Plaintiffs/Petitioners,

v.

Juan ACOSTA, Assistant Field Officer Director,
Miami Field Office, Immigration and Customs
Enforcement; David HARDIN, Sheriff of Glades
County; Marc J. MOORE, Field Office Director,
Miami Field Office, Immigration and Customs
Enforcement; Thomas HOMAN, Acting Director,
Immigration and Customs Enforcement; Kirstjen
NIELSEN, Secretary of Homeland Security,

      Defendants/Respondents.
_____/

## ORDER

THIS CAUSE is before the Court on Respondents' Motion to Dismiss for Lack of Subject Matter Jurisdiction (the "Motion to Dismiss") [ECF No. 25]. On December 18, 2017, Petitioners filed their Class Action Complaint [ECF No. 1] and Emergency Motion for Temporary Restraining Order and/or Stay of Removal (the "Motion") [ECF No. 3]. The Court held an emergency hearing on December 19, 2017. [ECF No. 10]. At the hearing, the government posited that the Court lacked subject-matter jurisdiction over this action. The Court ordered jurisdictional briefing and, on January 8, 2018, heard argument on the jurisdictional

1

issue. Having considered the Complaint, the parties' jurisdictional briefs, and argument of counsel, the Court finds that it has subject-matter jurisdiction to hear this case.

## I. BACKGROUND[1]

There are approximately 4800 Somali nationals with outstanding orders of removal who live in the United States. For decades, Somali nationals were seldom removed from the United States, in large part due to Somalia's lack of a functioning central government. Instead, Somali nationals with final removal orders—including some of the Petitioners—were placed under Orders of Supervision ("OSUPs"). The OSUPs authorized Somali nationals to remain in the United States and seek employment, provided they complied with periodic check-in requirements and other conditions of release. *See* 8 C.F.R. § 241.5. Until recently, only a small fraction of the Somali nationals with outstanding removal orders were ever actually removed to Somalia. However, in 2017, following a change in policy, United States Immigration and Customs Enforcement ("ICE") began deporting Somalis with increased frequency.

Petitioners are Somali nationals with final orders of removal who were present during ICE's failed attempt to deport them on December 7, 2017. Petitioners propose to represent a class that would include the 92 Somali men and women present on the December 7th deportation flight, as well as all Somali nationals with final orders of removal within the jurisdiction of the Miami ICE Field Office. [ECF No. 4]. Petitioners seek to reopen their removal cases to assert claims for asylum, withholding of removal, or relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Convention Against Torture") based on new circumstances that did not exist at the time their initial removal

---

1 These facts, accepted as true, are taken from the allegations in Plaintiffs' Complaint and their supporting declarations and affidavits. Respondents have failed to produce any evidence to dispute the allegations.

orders were entered. *See* 8 U.S.C. §§ 1158; 1231(b)(3); 8 C.F.R. §§ 208.16-18. Petitioners have a statutory right to file a motion to reopen their removal proceedings because they seek "[t]o apply or reapply for asylum or withholding of deportation based on changed circumstances arising in the country of nationality or in the country to which deportation has been ordered." 8 C.F.R. § 1003.2(c)(3)(ii). Petitioners ask this Court to stay their removal to afford them an opportunity to pursue this relief before the immigration courts.

### A. Changed Circumstances

Petitioners assert that their immigration circumstances have changed based on the escalation of Al-Shabaab–related violence in Somalia and the government's failed attempt to repatriate them to Somalia. Petitioners further contend that the international news attention surrounding the botched deportation flight have exacerbated the changed circumstances that make their return to Somalia unsafe. Based on these changed circumstances, Petitioners seek an opportunity to avail themselves of the administrative remedies afforded to them under U.S. immigration law. Petitioners argue that they will suffer an extreme injustice if the government were to remove them before they have a meaningful opportunity to seek relief based on the changed circumstances created, in part, by the U.S. government.

#### 1. Changed Conditions in Somalia

In the 1990s, Somalia was wrought by a civil war that left the country without a functioning central government. *See* U.S. DEP'T OF STATE, U.S. Relations with Somalia Fact Sheet (April 12, 2017), https://www.state.gov/r/pa/ei/bgn/2863.htm (last visited Jan. 25, 2018). Following the collapse of Somalia's government, numerous armed factions vied for control of its territory. *Id.* One of the main groups to rise from the governing vacuum was Al-Shabaab, an

extremist fundamentalist group[2] with reported ties to Al-Qaeda. After years of negotiations and attempted reconciliation, a transitional government was established in Somalia in 2004. *Id.* In 2012, Somalia completed its political transition by electing a new federal parliament and president. *Id.* While the United States formally recognized the new Federal Government of Somalia on January 17, 2013, the United States does not maintain a diplomatic presence in Somalia. *Id.*

Despite the progress made in Somalia, the U.S. Department of State continues to recognize the serious danger posed by Al-Shabaab to individuals in Somalia who do not share its ideology. For example, the Somalia 2016 International Religious Freedom Report states in pertinent part:

- The terrorist group al-Shabaab killed, maimed, or harassed persons suspected of converting from Islam or those who failed to adhere to the group's religious edicts.

- Al-Shabaab continued to impose violently its own interpretation of Islamic law and practices on other Muslims. Violent conflicts continued between al-Shabaab and the federal government and its allies.

*See* U.S. DEP'T OF STATE, SOMALIA 2016 INTERNATIONAL RELIGIOUS FREEDOM REPORT (2016), https://www.state.gov/documents/organization/268938.pdf.

In addition, the Somalia 2016 Human Rights Report states in pertinent part that:

- The terrorist organization al-Shabaab retained control of the Juba River Valley and maintained operational freedom of movement in many other areas in the southcentral part of the country.

- Clan militias and al-Shabaab continued to commit grave abuses throughout the country, including extrajudicial and politically motivated killings; disappearances; cruel and unusual punishment; rape; and attacks on

---

2  On March 18, 2008, the Secretary of State designated Al-Shabaab as a Foreign Terrorist Organization and as a Specially Designated Global Terrorist. *See* U.S. DEP'T OF STATE, Office of the Coordinator for Counterterrorism, *Designation of al-Shabaab* (Mar. 18, 2008), https://www.state.gov/j/ct/rls/other/des/143205.htm.

- employees of nongovernmental organizations (NGOs), the United Nations, and diplomatic missions.

- Al-Shabaab continued to kill civilians . . . . The killings included al-Shabaab's execution of persons it accused of spying for and collaborating with the FGS, Somali national forces, and affiliated militias.

*See* U.S. DEP'T OF STATE, SOMALIA 2016 HUMAN RIGHTS REPORT (2016), https://www.state.gov/documents/organization/265512.pdf.

On October 14, 2017, Al-Shabaab carried out a massive truck bombing in Mogadishu. The attack, referred to as "Somalia's 9/11," killed over 500 people. *See* Decl. of Mary Harper [ECF No. 3-3]. In response, the United States has engaged in numerous airstrikes against Al-Shabaab in Somalia. *See generally* U.S. AFRICA COMMAND, Press Releases, http://www.africom.mil/media-room/press-releases (last visited Jan. 25, 2018). Notably, as of January 10, 2018, Somalia maintains a "Level 4: Do Not Travel" Travel Advisory by the Department of State, which notes increased anti-American and anti-Western attitudes in Somalia. *See* U.S. DEP'T OF STATE—BUREAU OF CONSULAR AFFAIRS, Somalia Travel Advisory, https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Somalia.html (last visited Jan. 25, 2018).

### 2. The December 7th Flight

On December 7, 2017, ICE agents attempted to deport Petitioners to Somalia. Petitioners were bound and shackled and placed on a chartered airplane departing from a Louisiana detention center. The flight landed in Dakar, Senegal, for refueling. While accounts differ as to whether the plane remained grounded due to mechanical or crew-rest issues, it is not disputed that the plane remained grounded at the Dakar airport for approximately 23 hours. For unclear reasons, the flight could not continue to Somalia and was forced to return to the United States. On December 9, 2017, the plane landed in Miami, Florida. Petitioners remained bound and

shackled for the entirety of the 48-hour trip, including the 23-hour holdover in Senegal. Upon landing in Miami, some Petitioners were taken to the Krome Service Processing Center while others were placed in the Glades County Detention Center, where they remain detained.

Petitioners allege they were subjected to inhumane conditions and egregious abuse as the plane sat on the runway in Senegal. *See* Decls. of Petitioners [ECF No. 3-2]. Petitioners were left to urinate on themselves when the plane's lavatories overfilled with human waste. *Id.* In addition, Petitioners allege that ICE agents and/or government contractors physically assaulted them and subjected them to verbal abuse and threats. *Id.*

### 3. Resulting International Press Coverage

The details of the December 7th flight have garnered extensive international media coverage, including within Somalia. *See* Decl. of Abdinasir M. Abdulahi [ECF No. 3-4] (describing widespread media coverage of the December 7th flight within Somalia and listing several Somali news articles regarding same).[3] Petitioners contend that the extraordinary public attention from news reports[4] concerning the botched flight has placed them in increased danger of being targeted by Al-Shabaab because Al-Shabaab perceives people who are returning to Somalia after periods living in western nations as enemies of their cause who must be summarily executed. *See* Decl. of Mary Harper [ECF No. 3-3]. Petitioners argue that their perceived status

---

3   The news articles listed in the declaration are not written in English but appear to be from Somali news outlets. *See, e.g., http://gundhig.com/cilad-ku-timid-diyaarad-siday-soomaali-laga-soo-tarxiilay-mareykanka* (Dec. 9, 2017); *https://www.jowhar.com/wararka/cilad-ku-timid-diyaarad-siday-soomaali-laga-soo-masaafuriyay-dalka-mareykanka.html5* (Dec. 9, 2017); *http://radioshabelle.com/cilad-ku-timid-diyaarad-siday-muwaadiniin-soomaaliyeed-oo-laga-soo-musaafuriyay-maraykanka* (Dec. 9, 2017); *https://www.caasimada.net/diyaarad-siday-soomaali-laga-soo-tarxiilay-mareykanka-oo-hawada-ku-ciladowday* (Dec. 9, 2017); *https://www.garoweonline.com/so/news/somalia/cilad-ku-timid-diyaarad-siday-soomaali-laga-soo-tarxiilay-mareykanka* (Dec. 9, 2017).

4   The Court further notes that conducting a simple Google search of the terms "December Somalia flight" reveals numerous news articles regarding the December 7th flight.

6

as "westerners" with long standing ties to the United States—amplified by the government's own actions—places them at grave risk of torture and death at the hands of Al-Shabaab if they are repatriated to Somalia. *Id.* Petitioners argue that if they are removed prior to the filing and adjudication of motions to reopen, their ability to seek meaningful relief will effectively be foreclosed.

B. **Motions to Reopen and Administrative Barriers**

Individuals who have been ordered removed from the United States have the right to file a motion to reopen their immigrations case. *See* 8 U.S.C. § 1229a(c)(7). The Supreme Court has recognized that the motion to reopen process is a critical, statutorily-based procedural safeguard. *See Kucana v. Holder*, 558 U.S. 233, 242 (2010) ("The motion to reopen is an 'important safeguard' intended 'to ensure a proper and lawful disposition' of immigration proceedings.") (quoting *Dada v. Mukasey*, 554 U.S. 1, 18 (2008)). Petitioners seek to exercise their statutory right to move to reopen their removal cases based on circumstances that did not exist at the time their initial removal orders were entered.

Petitioners' primary argument is that they will be deprived of due process if they are removed before they have a reasonable opportunity to pursue their motions to reopen. In support, Petitioners argue that filing a motion to reopen is a time-consuming process because, according to the regulations, any motion to reopen must be supported by substantial documentary evidence of the changed circumstances. *See* 8 U.S.C. §1229a(c)(7)(B) ("The motion to reopen . . . shall be supported by affidavits or other evidentiary material."); 8 C.F.R. § 1003.2(c)(1) ("A motion to reopen proceedings shall state the new facts that will be proven at a hearing . . . and shall be supported by affidavits or other evidentiary material. A motion to reopen proceedings . . . must be accompanied by the appropriate application for relief and all supporting documentation."); *see*

7

*generally* Decl. of Trina Realmuto [ECF No. 3-6] (describing the difficulties in obtaining the documentary evidence required by regulation to file a viable motion to reopen and noting it may take six to twelve weeks to adequately prepare and file a motion to reopen and application for relief). Without sufficient time to file motions that comply with the statutory and regulatory requirements, Petitioners' prospective motions would be meaningless and the relief they seek would be rendered illusory.

In addition, Petitioners contend that the administrative procedures in place to adjudicate emergency stay requests are insufficient in this case because any motion to stay filed with the immigration court or Board of Immigration Appeals ("BIA") must be preceded by a motion to reopen. Therefore, Petitioners must prepare and file their motions to reopen and their applications for asylum, withholding of removal, or relief under the Convention Against Torture, with all evidence showing that circumstances have changed since their last immigration hearing, *before* they are able to seek an administrative stay. Furthermore, the filing of an administrative motion to stay does not automatically prevent removal and there is no requirement that a removal be delayed while an administrative motion to stay is pending. Petitioners argue that in light of the grave risk of torture and persecution they face if removed to Somalia, they must be provided a reasonable opportunity to have their motions to reopen and stay filed and decided before they are removed for the process to be adequate.

## II. DISCUSSION

Petitioners filed this habeas petition pursuant to 28 U.S.C. § 2241 and 28 U.S.C. § 1331, raising claims under the Immigration and Nationality Act ("INA"), the Convention Against Torture, and the Due Process Clause of the Fifth Amendment of the United States Constitution, and seeking temporary stays of their removal. Petitioners seek to stay their removals until they

8

have meaningful opportunities to move to reopen their immigration cases based on changed circumstances and have their cases heard.

At this stage, the only issue before the Court is whether it has jurisdiction. Petitioners contend that the Court has two independent avenues for finding jurisdiction in this case. Petitioners first argue that Congress did not intend to eliminate habeas jurisdiction under the INA in these types of cases. In the alternative, Petitioners argue that the Court can find habeas jurisdiction under the Suspension Clause despite the jurisdiction-stripping language of the INA. In response, the government argues that the 2005 REAL ID Act amendments to 8 U.S.C. §§ 1252(b)(9) and 1252(g), and the addition of § 1252(a)(5), divest this Court of subject-matter jurisdiction to review the Petitioners' orders of removal. The government argues that the Suspension Clause does not provide the Court jurisdiction to hear Petitioners' claims because an adequate remedy exists whereby Petitioners can file motions to reopen and seek stays of removal from the immigration courts or BIA. The government further argues that the circumstances of this case are insufficient to find the INA unconstitutional as applied to Petitioners.

### A. The REAL ID Act

The REAL ID Act was signed into law in 2005. The REAL ID Act amended 8 U.S.C. § 1252 with respect to judicial review of orders of removal. The amended statute reads:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

*See* 8 U.S.C. § 1252(g). Respondents argue that this provision has the effect of placing Petitioners' claims beyond the jurisdiction of this Court since Petitioners are effectively

challenging the execution of their removal orders by arguing that new circumstances justify reopening their immigration cases.

Two recent district court decisions have addressed the same issue presently before the Court. In *Hamama v. Adduci*, 258 F. Supp. 3d 828 (E.D. Mich. July 11, 2017), the petitioners were Iraqi citizens with removal orders who the government was unable to remove for many years due to conditions in Iraq. In *Devitri v. Cronen*, CV 17-11842-PBS, 2017 WL 5707528 (D. Mass. Nov. 27, 2017), the petitioners were Indonesian Christians who similarly had longstanding removal orders because the government was unable to remove them for many years. In *Hamama* and *Devitri,* the petitioners sought habeas relief in the district courts, seeking stays of removal so they could file motions to reopen based on changed country conditions. Both the *Hamama* and *Devitri* courts found that 8 U.S.C. § 1252(g) unambiguously stripped them of jurisdiction over the petitioners' claims. This Court agrees that the statutory text is unambiguous and does not support Petitioners' first argument that Congress did not intend to eliminate habeas jurisdiction under the INA in this type of case. However, as discussed below, the courts in *Hamama* and *Devitri* proceeded to analyze whether 8 U.S.C. § 1252(g), as applied to the specific circumstances of the petitioners, violated the Suspension Clause. *See Hamama*, 258 F. Supp. 3d at 839-43 (finding jurisdiction under the Suspension Clause despite the jurisdiction-stripping language of the INA); *Devitri*, 2017 WL 5707528 at *5 (same). The same argument is raised by Petitioners here.

### B. The Suspension Clause

The Suspension Clause of the United States Constitution dictates that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. CONST. art. I, § 9, cl. 2. The writ of habeas corpus has long been viewed as a vital instrument to challenge an unlawful restraint of liberty.

*Boumediene v. Bush*, 553 U.S. 723, 739 (2008); *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) (recognizing that the "writ of habeas corpus allows the Judicial Branch to play a necessary role in maintaining this delicate balance of governance, serving as an important judicial check on the Executive's discretion in the realm of detentions."). "[T]he Supreme Court has noted that this Clause requires 'some judicial intervention in deportation cases.'" *Muka v. Baker*, 559 F.3d 480, 483 (6th Cir. 2009) (quoting *I.N.S. v. St. Cyr*, 533 U.S. 289, 300 (2001)).

Congress may eliminate habeas jurisdiction in certain cases without running afoul of the Suspension Clause as long as adequate and effective alternatives to habeas corpus relief are provided. *See St. Cyr*, 533 U.S. at 314 n.38 ("Congress could, without raising any constitutional questions, provide an adequate substitute through the courts of appeals."); *Swain v. Pressley*, 430 U.S. 372, 381 (1977) (holding that "the substitution of a collateral remedy which is neither inadequate nor ineffective to test the legality of a person's detention does not constitute a suspension of the writ of habeas corpus"). Petitioners correctly do not challenge the facial validity of the REAL ID Act. Instead, they challenge its adequacy and effectiveness, as applied to their unique circumstances in this case.

The Court recognizes that section 1252(g) generally divests the district courts of jurisdiction to review any claim arising from a decision by the government to execute a removal order. However, that law violates the Suspension Clause as applied if it deprives Petitioners of a meaningful opportunity to exercise their statutory right to file motions to reopen their immigration cases in a manner that comports with the onerous statutory and regulatory requirements. *See Boumediene*, 553 U.S. at 781-782 (recognizing the importance of due process considerations in the habeas context); *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The

fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.") (internal quotations omitted).

While the motion to reopen process is facially adequate, it does not provide an adequate and effective remedy for the exceptional circumstances of this case. The changed circumstances giving rise to Petitioners' potential reopen claims arose very recently. In particular, Petitioners' claims based on the botched December 7th flight clearly could not have been raised prior to the flight occurring. Moreover, the Court finds troubling that the government would seek to immediately re-remove[5] Petitioners when their claims arose, in great part, from the government's own alleged misconduct. Petitioners cannot effectively pursue motions to reopen from Somalia where they would likely be forced underground to avoid persecution immediately upon arrival. The Court is unpersuaded by the government's position that Petitioners can meaningfully pursue a motion to reopen from Somalia. It is unclear how Petitioners could access their immigration files or witnesses in the United States with relevant information pertaining to the December 7th flight, all the while attempting to avoid persecution in Somalia.

The motion to reopen process can be an adequate and effective alternative to habeas relief only if individuals are given a meaningful opportunity to exercise their rights guaranteed by law. *See* 8 U.S.C. § 1229a(c)(7)(C)(ii). Based on the unique circumstances of this case, including the botched flight, the resulting news coverage, and escalation of violence in Somalia, the Court finds it has limited jurisdiction to ensure Petitioners are able to exercise rights afforded to them under U.S. law.

---

5 The Court held a telephonic hearing on December 19, 2017, where the government confirmed that Petitioners were scheduled to be removed from the United States the following day. The Court suspects that absent its intervention, the government will attempt to remove Petitioners as fast as possible.

## III. CONCLUSION

While the Court recognizes that the executive branch has broad discretion to carry out removal orders, the Court finds that is has jurisdiction in this case to prevent an unlawful exercise of that discretion against these specific Petitioners. As applied in these circumstances, the jurisdictional bar in 8 U.S.C. § 1252(g) would preclude Petitioners from raising their new legal claims in a manner which comports with the law, in violation of the Suspension Clause. Therefore, the Court finds that the jurisdiction stripping provisions of the REAL ID Act are unconstitutional as applied to Petitioners, based on the extraordinary circumstances of this case, because it suspends their right to habeas relief without providing an adequate and effective alternative. Therefore, the Court concludes that it has subject-matter jurisdiction.

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Respondents' Motion to Dismiss [ECF No. 25] is **DENIED.**

2. Respondents are temporarily **ENJOINED** from removing Petitioners from the United States until the Court issues an Order on the Motion for Temporary Restraining Order [ECF No. 3], which the Court now construes as a Motion for Preliminary Injunction.

3. The terms of the Court's Orders Staying Removal [ECF Nos. 14, 19] shall remain in effect until further order of the Court.

4. The parties shall appear before this Court on the 1st day of February, 2018, at 10:00 a.m. in Courtroom 11-1 of the Wilkie D. Ferguson, Jr., United States Courthouse in Miami, Florida, for a Status Conference.

5. The parties shall be prepared to discuss a briefing schedule on the merits of the Motion for Class Certification [ECF No. 4] and Motion for Preliminary Injunction [ECF No. 3].

Pursuant to Rule 65(a)(2), the parties shall also be prepared to discuss whether the Court should consolidate a trial on the merits with the hearing on the Motion for Preliminary Injunction.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 26th day of January, 2018.

_____
DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE